UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| RICHARD BLACK, | ) | |
| --- | --- | --- |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 08 C 5988 |
| CITY OF CHICAGO, et al., | ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

In the early morning hours of October 20, 2006, a group of armed men knocked on Plaintiff Richard Black's front door, pointed a gun at him, and forced him to let them into his home. Once inside, the strangers demanded to know the whereabouts of Black's roommate Anthony Scott, a parolee registered with the Illinois Department of Corrections ("IDOC"). Black and others in the home told the men that Scott was not there. The men searched the residence for Scott and then departed. They did not take, touch, or damage anything.

Black, a *pro se* litigant, believes that the men were Chicago Police Officers in the company of an IDOC parole officer and that the group was acting pursuant to "Operation Spotlight," a statewide law enforcement effort that sought to aggressively enforce Illinois's parole laws. In this lawsuit, brought pursuant to 42 U.S.C. § 1983, Black alleges that the armed men threatened him and searched his home in violation of the Fourth Amendment and that the City of Chicago is liable.[1] Black has never actually determined the identities of the armed men who entered his residence,

---

[1] In his initial complaint, Black sought to bring an action against former Illinois Governor Rod Blagojevich, former Chicago Police Superintendent Phil Cline, former Chicago Interim Police Superintendent Dana Starks, former IDOC Director Roger Walker, and former Assistant IDOC Director Deanne Benos. On October 23, 2008, this court dismissed Black's claims against those Defendants, and granted Black leave to amend the complaint to include the City of Chicago, Police Superintendent Jody Weis, and several "John Doe" defendants to represent the unknown individuals. (D.E. 4.) On October 30, 2008, Black filed an amended complaint naming only the City and Weis, and the court subsequently granted the City's motion to dismiss the claims against Weis. (D.E. 6; D.E. 31.) The City of Chicago is now the sole remaining Defendant.

however; he has not named any individual officers as defendants; and he has produced no evidence that any of the wrongdoers were officers acting pursuant to City policy. There is, thus, no basis for a finding of liability against the City under *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 690-91 (1978). For this reason, explained more fully below, the court grants the City's motion for summary judgment on all of Black's claims.[2]

## BACKGROUND

On summary judgment, the court views the facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor. *See Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009). Accordingly, the court draws the following account primarily from the witness testimony that Black has presented regarding the events of October 20, 2006.

### I. The Entry Into Black's Residence

Plaintiff Black lives with his girlfriend, Marva Scott, and her adult children in an apartment on Chicago's northwest side. Marva's adult daughter, Karen Scott, is the leaseholder on the property. (K. Scott Dep. at 27.) Karen's brother, Anthony Scott, is on parole from the IDOC and reports the apartment as his primary residence. (*Id.* at 14-15.) Anthony's parole officer visited the apartment before October 20, 2006, and Karen knew him by sight. (*Id.* at 29.) Black himself is also on parole for an unrelated offense. (Black Dep. at 39-40.)

At 5:00 or 6:00 a.m. on the morning of October 20, 2006, Black was disturbed by someone knocking on his bedroom window. He pulled back the curtain and saw a Caucasian man who

---

[2] Black has also filed a cross-motion for summary judgment and a motion to strike the City's statement of facts. Both motions are denied. Even when viewed in the light most favorable to Black, the facts do not support the conclusion that the men who threatened him and entered his home were in fact police officers acting pursuant to any official policy. This failure of proof requires the entry of summary judgment in favor of the City and dooms Black's own summary judgment motion. Black's motion to strike the City's 56.1 Statement because of that document's supposed "misstatements of fact" is also denied. The court has independently reviewed the entire record in this case, and concludes that the City's statements, though occasionally argumentative, are permissible characterizations of the evidence.

2

professed to be the parole officer for Anthony Scott.  (*Id.* at 18.)  The man shouted through the window glass that he wished to speak with Anthony.  Black shouted back that Anthony was not at home, but the man gestured that he did not understand.  Black then stepped to the front door and opened it to find a group of armed men waiting outside. One of the men had his gun drawn–a short assault weapon that Black described as an "Uzi"–and pointed it at Black.  (*Id.* at 21, 38.)[3]  The man brandishing the Uzi told Black that he was a police officer, but none of the men were in uniform, and none showed a badge, nor did Black see any squad cars parked outside.  (*Id.* at 28, 55.)  "I did not go through an I.D. check with them," Black testified.  "They got the guns."  (*Id.* at 43.)  None of the men gave their names.  Black testified that some of the men were wearing what appeared to be army fatigues.  He also claims that one man was wearing dark clothing that, in Black's view, "indicated he was police." (*Id.* at 21.)

According to Black, the man pointed the Uzi "in [Black's] face" and asked to be admitted into the apartment.  (*Id.* at 28.)  Black told the men that he was going to get the leaseholder, but as he turned away from the door, the men entered behind him, rendering Black unable to close the door. (*Id.* at 28-29.)  Once inside the apartment, Black said, one or more of the intruders went to wake up Karen and Marva in their bedrooms.  (*Id.* at 29-30.)

Karen Scott testified that she stepped out of her bedroom as the men entered the apartment.  (K. Scott Dep. at 15.)  She remembered seeing one "black guy" and one "white guy." (*Id.* at 16.)  Neither was in police uniform, Karen said, but the African-American man was wearing dark-camouflage army fatigues.  (*Id.* at 16-17.)  When asked how many men there were total, Karen said that she thought "[i]t was like two or three.  Maybe more.  I am not sure."  (*Id.* at 17.)  At no point did Karen hear the men identify themselves as either police or parole officers.  (*Id.* at 22.)

---

[3] "Uzi" refers to a brand of automatic and semi-automatic handheld machine gun that was originally developed by Israeli Army Captain Uziel Gal for use by the Israeli military in the 1950s. *See* Israel Military Industries Homepage, http://www.uzi.com/index.html (last visited Aug. 11, 2010.)

None of the men gave their names or showed any identification at any point. (*Id.* at 31-32.) Some of the men were carrying guns, Karen said, but she never saw any of the men point their guns at anyone. (*Id.* at 26.) None of the men looked like the parole officer that Karen had seen previously visit Anthony at the apartment. (*Id.* at 30.)

Black remembered that one of the men who entered the apartment, a Caucasian wearing a trench coat, went through the entire apartment looking for Anthony. (Black Dep. at 32.) The man was not wearing anything that identified him as a law enforcement officer, nor did he identify himself as a police or parole officer. (*Id.* at 40.) Karen described the same man and said he carried a flashlight. (K. Scott Dep. at 18.) She further testified that the man did not touch, take, or disturb anything as he was walked through the house. (*Id*. at 19.)

The rest of the men remained in a common room near the entrance, where the family had assembled. (Black Dep. at 32-33.) None of them touched or disturbed anything. (*Id.*) Black claims that the men instructed him not to move, but Karen recalled that she was permitted to move freely about the apartment. (*Id*. at 33; K. Scott Dep. at 32-33.) A man with dark skin and a mustache, described by Black as "the leader," asked the family where Anthony was. (Black Dep. at 31.) Karen responded that Anthony might be staying at another family member's house. (*Id*. at 36.) She refused to provide the men with an address, however, and the other family members present also refused to provide any additional information. (*Id*.) The man who had previously pointed the Uzi at Black warned that he would "bring in the dogs" if the family was not forthcoming about Anthony's whereabouts. (*Id*. at 38) But neither Black nor Karen saw any dogs outside, nor did the threat move the family to offer any further information. (*Id.*; K. Scott Dep. at 26.)

After a short interval, the man with the dark skin and the mustache told the other men "that Anthony was the one on parole and not his family, and that they should leave." (Black Dep. at 39.) The group of intruders then left the apartment without saying anything else. (*Id*. at 44.) Black estimated that the entire incident lasted roughly 10 minutes. (*Id*. at 40.) He admitted that the

incident did not cause him any physical, emotional, or psychological damage, but he did comment that from now on he will "have to be careful" when answering his door because "I don't want to get another [U]zi stuck in my face." (*Id.* at 56.)

## II.  Operation Spotlight

In 2003, then-Illinois Governor Rod Blagojevich announced "Operation Spotlight," a statewide effort to enhance parolee supervision and reduce recidivism rates. An IDOC press release from 2005 described the operation as "the Most Aggressive Offender Supervision Program in Illinois'[s] History" and stated that the program was intended to "reduce repeat crime among convicted felons on parole over the long-term by improving three areas: increased parolee contacts, more effective risk assessment and support, and improved cooperation with local law enforcement, service providers, and community." March 2005 IDOC Press Release, http://www.idoc.state.il.us/subsections/assistant_director/Press%20Paper%20--%20Operation%20Spotlight%20(march%202005).doc (last visited Aug. 11, 2010).[4] Attached to his memorandum in opposition to summary judgment, Black has produced a similar press release from the Office of the Illinois Governor, which states:

> As part of the Governor's Operation Spotlight Parole Reform Program to address public safety, the Illinois Department of Corrections teamed up with multiple law enforcement agencies to conduct 63 parole compliance check operations throughout the state in 2004. The early morning operations continue to be conducted in Illinois cities to ensure parolees are complying with the requirements of their Parole.

(Ex. B to Pl.'s Resp.) Black believes that the search of his home was one of the "early morning operations" described in the press release. He offers no other evidence (i.e. IDOC or police

---

[4]  For a press account of Operation Spotlight, see Sarah Karp, *In the Spotlight*, THE CHICAGO REPORTER, May 2005, at A1 ("In 2003, Gov. Rod Blagojevich and Illinois Department of Corrections officials launched Operation Spotlight, an initiative under which the state would spend millions to double its number of parole officers and provide them with case-management training and laptop computers to better track parolees and help them find work and services, like drug treatment. In addition to monitoring parolees, the parole officers would also be expected to help them stay on the straight and narrow---and stay out of prison.")

records) to show that the armed men who entered his home were acting pursuant to Operation Spotlight.[5]

## III. Chicago Police and IDOC Records and Activities

The City of Chicago denies that its officers ever executed a parole compliance check or other search at Black's apartment, whether pursuant to Operation Spotlight or for any other reason. The City reports that it has no record of any search or raid at Black's address on the day in question. (Def. Resp. to Interog. ¶ 1.) (Ex. F to Def. Mot. at 2.) Similarly, in response to a subpoena for documents regarding the incident, IDOC's Legal Counsel Delcine Thompson reported that IDOC officers did not conduct any parole compliance checks on October 20, 2006. (IDOC Letter, Ex. F to Def. Mot.) October 20, 2006 was a Friday, and Thompson stated that IDOC never conducts parole compliance checks on Fridays. (*Id.*) In addition, Thompson stated that the IDOC has no record of any parole compliance check executed during the entire week in question at Black's residence. (*Id.*)

Robert Marszalek, the parole agent assigned to Anthony Scott during the relevant time period, also stated that he did not recall conducting any parole compliance checks on October 20, 2006. (Marszalek Aff. ¶ 8.) The records in Marszalek's case file for Anthony make no mention of such a check. (*Id.* at ¶ 10.) Marszalek estimates that he has participated in some 15 to 20 parole compliance checks under Operation Spotlight over the course of his career but, he said, he typically works in the afternoon and has "rarely" participated in early morning checks. (*Id.* at ¶ 7.) He further stated that he has not "been called for that [early morning] duty for several years." (*Id.*) "To the

---

[5] At different times, Black has also posited that the men were acting pursuant to various other local, state, and national law enforcement policies. His memorandum makes reference to "Operation Windy City" and "Project Safe Neighborhoods," two programs that also call for parolee compliance checks. In other filings, Black has also referenced the "Traveling Vice Lords/New Breed Task Force," a special unit established by the Chicago Police Department to disrupt and interdict gang violence in the City. It is unclear what such a unit might have to do with Anthony Scott or the alleged search of Black's home.

best of my knowledge," Marszalek stated, "I did not conduct a parolee compliance check for Anthony Scott at [Black's address] on October 20, 2006." (*Id.* at ¶ 11.)[6]

## DISCUSSION

While this court construes Black's *pro se* filings broadly, Black is still subject to the Rules of Civil Procedure in the same manner as any other litigant. *See Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)). Under those rules, summary judgment is appropriate when, based upon the record, there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "When the non-moving party fails to establish 'the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' Rule 56(c) mandates entry of summary judgment against that party because 'a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In this lawsuit, Black has elected not to name the unknown individuals who supposedly entered his residence as defendants, despite this court's granting him leave to do so. Instead, he

---

[6] Black points out that the "inmate search" records produced by the City, apparently misidentify Anthony Scott's date of birth. He produces an affidavit from Marva Scott, attesting that her son Anthony's date of birth is not accurately reflected on one of the City's documents. (Ex. E to Def. Resp.) On this basis, Black intimates that the City and IDOC have searched and produced parole records for the wrong Anthony Scott. (Def. Resp. 2-3.) The records, however, mention a number of other identifying characteristics of Anthony Scott (i.e. a physical description and photograph, criminal history, and internal identifying codes), and Black does not take issue with the accuracy of these identifiers. In addition, the evidence reflects that the record searches by the City and the IDOC were conducted based on names, addresses, and dates that are undisputed in the record. The apparent error in reporting Anthony Scott's date of birth on the single "inmate search" document, therefore, has no bearing on the apparent accuracy of the other records that have been searched or produced in the course of this litigation.

7

has pursued only the City of Chicago based on a *Monell* theory of liability.[7]  There is no cause of action for *respondeat superior* liability against a municipal corporation under Section 1983. *Thompson v. Boggs*, 33 F.3d 847, 859, FN 11 (7th Cir. 1994) (citing *Monell*, 436 U.S. at 694-95). Instead, for a municipality to incur Section 1983 liability, the constitutional harm must be occasioned by an official "government policy or custom." *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004) (citing *Monell*, 436 U.S. at 694).  Here, Black claims that his constitutional rights were violated pursuant to the City's participation in IDOC's official policy and practice of conducting early-morning parolee compliance checks.[8]  To succeed on such a claim, Black must establish that the municipal policy or practice was the "direct cause" or "moving force" behind the constitutional violation.  *See Minix v. Canarecci*, 597 F.3d 824 (7th Cir. 2010).  He is unable to do so.

To begin with, there is nothing inherently unconstitutional about an official policy that involves regular checks to ensure parolee compliance, even if those checks include the occasional surprise visit to a parolee's home.  Those on parole do not enjoy "the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special restrictions." *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (warrantless search of probationer's home did not violate the Fourth Amendment) (internal citation omitted).  Supervision of parolees is a "special need" of the state that permits "a degree of impingement upon privacy that would not

---

[7] Black himself does not actually cite *Monell* in his briefs, but his claim against the City is clearly based on a *Monell* theory.

[8] Under the *Monell* doctrine, a municipality is liable if (1) its officers act pursuant to an express policy that, when enforced, causes a constitutional deprivation; (2) its officers carry out a "wide-spread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) the constitutional injury was caused by a person with "final decision policymaking authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir.1995).  Black appears to proceed under the first theory by pointing to an express policy, Operation Spotlight, that he believes occasioned his constitutional harm.

be constitutional if applied to the public at large." *Id.* at 875. On its face, the City's participation in the IDOC's "Operation Spotlight" does not pose a constitutional problem.

Nor has Black established that any of the alleged constitutional harms in this case are attributable to the official policies or practices of Defendant. Black alleges that a number of unknown individuals visited the home he shares with parolee Anthony Scott. If these individuals were in fact law enforcement officers seeking to determine whether Mr. Scott was complying with the terms of his parole, a finder of fact could reasonably infer that their *visit* was the result of Operation Spotlight. The visit, however, does not form the basis of Black's claims. Rather, Black complains of specific misconduct by the unknown individuals involved: (1) one of them pointed a gun at Black; (2) all of them entered the apartment without Black's permission;[9] and (3) one or some of them ordered Black not to move and threatened to "bring in the dogs" when Black and others refused to answer questions. Black has not demonstrated that this *apparent misconduct* by the individuals involved may be attributable to Operation Spotlight or any other official policy of the City.

Nothing in the materials that Black has produced indicates that the City maintained a policy or practice of endorsing or tolerating the forced entry of parolees' homes or the threatening of parolees' families. Black offers no evidence concerning the City's training or instruction of officers in the conduct of parolee compliance checks, and he has not shown that any of the City's training practices are "likely to result in the violation of constitutional rights." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). By the same token, Black has produced no evidence from which a finder of fact could infer that the City acted with "deliberate indifference" in the face of "actual or constructive"

---

[9] The City's baseless argument that Black implicitly consented to the men's entry of the apartment is not worthy of serious consideration. Black testified that one of the unidentified men stuck an assault weapon in Black's face when he requested admission to the residence. Any reasonable person would not feel free to refuse such a request.

notice that its policies were likely to result in constitutional deprivations. *Cornfield v. Consolidated High School Dist. No 230*, 991 F.2d 1316, 1327 (7th Cir. 1993).

In short, Black has not provided sufficient evidence to establish "that there is a true municipal policy at issue, [rather than] a random event." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005); *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the [policy] and the constitutional deprivation.") Thus, Black cannot "establish a causal nexus between his injury and the municipality's alleged policy or custom." *Palmquist v. Selvick*, 111 F.3d 1332, 1344 (7th Cir. 1997). This failure of proof dooms all of Black's claims against the City.

In fact, Black has not adduced evidence that the individuals allegedly responsible for violating his rights were agents of the City at all. "[I]t is well established in this Circuit that a municipality's liability for a constitutional injury 'requires a finding that the individual officer[] [is] liable on the underlying substantive claim.'" *Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000) (quoting *Tesch v. County of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998)). In this case, there is no evidence concerning the identities of the men who entered Black's home, nor any admissible evidence that they were Chicago Police Officers. At best, the testimony of Black and Karen Scott establishes that the men carried weapons and represented that they were law enforcement officers. They did not, however, have uniforms or badges and never gave Black their names. Official police and IDOC records do not reflect any law enforcement action of the type that Black describes, and Anthony Scott's parole officer stated under oath that he did not conduct a compliance check at Scott's residence on the day in question. Black, who bears the burden of production in this case, has not demonstrated a material dispute of fact on this issue. Even viewing the facts in the light most favorable to Black, there is no evidence that the unidentified men were

agents of the City nor that they were acting pursuant to any official municipal policy. Assuming that all of the acts Black complains of actually occurred, he has still failed to demonstrate that the City of Chicago may be held liable for such acts. Summary judgment in the City's favor is therefore appropriate.

## CONCLUSION

Defendant's motion for summary judgment [54] is granted. Black's motion for summary judgment [51] and motion to strike [74] are denied.

ENTER:

Dated: August 16, 2010

_____
REBECCA R. PALLMEYER
United States District Judge